IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-02602-PAB-MEH

BRUCE ERVIN,

      Plaintiff,

v.

WILSON, D.C.,
KELLER, Health Services Administrator,
LISA GREGORY, and
Five John/Jane Does,

      Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Michael E. Hegarty, United States Magistrate Judge**.

    Before the Court is Defendant Kellar's[1] Motion for Summary Judgment [filed February 20, 2014; docket #88]. The motion has been referred to this Court for recommendation. (Docket #89.) The motion is fully briefed, and the Court finds that oral argument will not assist in the adjudication of the motion. Based upon the record herein and for the reasons that follow, the Court RECOMMENDS that Defendant's motion be **GRANTED**.[2]

---

[1]There is nothing on the docket indicating that Defendants Wilson or Gregory have been properly served in this case. On March 4, 2013, the U.S. Marshal attempted to serve Wilson, but he was no longer employed with the Bureau of Prisons and they were unable to locate him. Docket #23. As for Defendant Gregory, according to the Amended Complaint, she is located in Kansas City, KS and has not been served. *See* docket #39.

[2]Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72. The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive or general objections. A party's failure to file such written objections to

## BACKGROUND

Plaintiff initiated this lawsuit pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) on October 1, 2012, as a *pro se* litigant incarcerated in the Federal Prison Camp (FPC) in Florence, Colorado.

### I.     Procedural History

Defendant Kellar responded to the Complaint by filing a motion to dismiss arguing the Plaintiff failed to allege that Kellar was involved in any delay of medical treatment, that Kellar was motivated to or intentionally delayed medical treatment, that any delay in medical treatment resulted in substantial harm, and that any claims against Kellar in his official capacity were barred by sovereign immunity.  Docket #28.  On April 17, 2013, this Court held a scheduling conference at which the Court set deadlines for discovery and dispositive motions in this case.  Docket #35.

On May 24, 2013, the District Court adopted this Court's recommendation to grant the motion to dismiss and, because Plaintiff had not yet had the opportunity to do so, to allow the Plaintiff to amend his Complaint to cure the deficiencies noted in the recommendation.  Docket #40.  Plaintiff filed an Amended Complaint on May 13, 2013, apparently in anticipation of the District Court's order.  Docket #39.  The District Court affirmed its acceptance of the Amended Complaint on June 5, 2013.  Docket #43.  The amended pleading now alleges that Kellar, rather than Defendant Wilson, compelled Plaintiff to "run through the process all over again" to obtain approval for

---

proposed findings and recommendations contained in this report may bar the party from a de novo determination by the District Judge of the proposed findings and recommendations.  *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1).  Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual findings of the Magistrate Judge that are accepted or adopted by the District Court.  *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *In re Garcia*, 347 F. App'x 381, 382-83 (10th Cir. 2009).

cataract surgery and, thus, intentionally delayed medical treatment for the Plaintiff. *Compare* Amended Complaint, docket #39 at 4 *with* Complaint, docket #1 at 4.  Plaintiff further claims that Kellar, knowing Plaintiff had subsequently seen an optometrist in Florence in October 2012 and had been referred for cataract surgery, delayed treatment by submitting the referral to the North Central Region for approval and the referral was denied.  Amended Complaint, docket # 39 at 7.

Based on these allegations, Plaintiff claims that Defendants, including Kellar, deprived him of his Eighth Amendment right against cruel and unusual punishment by Kellar's deliberate indifference to Plaintiff's serious medical needs. *Id.* at 7-8.  Plaintiff requests compensatory and punitive damages as relief against the individual Defendants jointly and severally, and injunctive relief against the Defendants in their official capacities in the form of an order requiring cataract surgery to be performed immediately. *Id.* at 14.

Rather than file a responsive pleading, Kellar sought leave to file a motion seeking summary judgment as to Plaintiff's alleged failure to exhaust administrative remedies.  Docket #44.  This Court granted the request (docket #46) and, following briefing on the motion for summary judgment, recommended that the motion be denied (docket #56).  Meanwhile, Defendants filed an Answer to the Amended Complaint on July 17, 2013.  Docket #55.  The Honorable Philip A Brimmer adopted this Court's recommendation on August 8, 2013.  Docket #58.

Thereafter, this Court granted Defendant's motion for extension of the discovery deadlines (docket #61) and, as discovery proceeded, granted Plaintiff's request for extensions of the deadlines as well (docket #83).  Defendant Kellar timely filed the present motion for summary judgment as to the merits of Plaintiff's sole claim against him for deliberate indifference in violation of the Eighth Amendment.  Kellar argues that Plaintiff's claim is based on the incorrect premise that Kellar

had the authority to approve and arrange cataract surgery once Plaintiff arrived in Colorado; however, only the BOP's Regional Medical Director has such authority.  Furthermore, Kellar claims that Plaintiff cannot demonstrate a genuine issue of material fact as to either the objective or subjective standards necessary to prove an Eighth Amendment claim.  Accordingly, Kellar asserts that he is entitled to qualified immunity.

Plaintiff counters that there is no dispute he is going blind from cataracts, and argues that the surgery has not yet been performed.  Plaintiff seeks an order that requires performance of the surgery by a date certain.  Plaintiff also argues that counsel for Defendant Kellar has created a conflict by filing the motion only on behalf of Kellar and not the other Defendants.  Further, Plaintiff contends that Defendants ask the Court to sanction a policy that allows the BOP to deny approved, necessary surgery.  Plaintiff proceeds to object to the Defendants' affidavits attached in support of the motion.  Plaintiff also claims that even though he was eventually seen by an ophthalmologist and approved for cataract surgery, he should have been seen immediately after transfer to Florence, Colorado.  Further, Plaintiff disputes Defendants' version of undisputed facts, including that Plaintiff does not claim Kellar failed to approve the surgery, but that Kellar failed to do anything to facilitate the surgery that was approved in Texas.  Plaintiff asserts that he has no evidence to support his motion for summary judgment because he is in prison and because defense counsel instructed the mail room clerk to deny Plaintiff's request for a copy of his deposition.  Finally, Plaintiff argues that Kellar is not entitled to qualified immunity because he knew about the approved surgery but was deliberately indifferent in failing to arrange the surgery.

Kellar replies that Plaintiff fails to rebut the evidence provided in support of his motion for summary judgment simply by asserting arguments in a brief.  Kellar also contends that Plaintiff was

4

not entitled to a copy of his deposition at the prison facility; rather, it was Plaintiff's obligation to request and pay for a copy of his deposition directly from the court reporter. Further, Kellar asserts that Plaintiff does not dispute the fact that Kellar timely referred Plaintiff to see Dr. Wilson and was seen by Dr. Wilson, then Kellar served on the Utilization Review Committee ("URC") and twice recommended that Plaintiff be seen by an ophthalmologist. Finally, Kellar argues that to the extent Plaintiff claims Kellar failed to follow policy or procedure from Texas regarding the approval for surgery, a violation of federal regulations or internal policy does not constitute a constitutional violation.

## II.     Findings of Fact

The Court makes the following findings of fact viewed in the light most favorable to the Plaintiff, who is the non-moving party in this matter.

1.      Plaintiff was incarcerated at the Federal Correctional Institute (FCI) Bastrop in Texas commencing January 27, 2005. Inmate History, April 22, 2013, docket #47-1 at 12.

2.      On May 18, 2012, while incarcerated in Texas, the South Central Regional Director approved cataract surgery, but the surgery was never scheduled. FCI Bastrop Health Services Notification to Inmate of Medical Action/Results, May 16, 2012, docket #88-3 at 20; *see also* Declaration of James Pelton, February 19, 2014 ("Pelton Declaration"), ¶¶ 11,14.

3.      A "medical hold" status was established at the BOP "to prevent the movement of inmates undergoing medical procedures, treatments and diagnostic interventions." Memo re: Medical Hold Status - Procedures and Implementation, January 24, 2011, docket #88-3 at 18. "Utilizing the Bureau Electronic Medical Record (BEMR) and Sentry, a 'Medical Hold' patient identifier will be designated to any inmate who is scheduled to undergo an approved surgical intervention within 30

days of the scheduled transfer date." *Id.*

4.      Plaintiff was transferred from FCI Bastrop to Federal Prison Camp (FPC) Florence prior to the cataract surgery taking place because he was not designated a "medical hold" and was not then scheduled to undergo surgery on a specific date.  Pelton Declaration, ¶ 14, docket #88-3; *see also* BOP Health Services Inmate Intra-System Transfer, July 25, 2012, docket #88-3 at 21.

5.      On August 27, 2012, the National Inmate Appeals Administrator responded to Plaintiff's BP-11 appeal confirming that cataract surgery was approved on May 18, 2012 and that Plaintiff was transferred from FCI Bastrop to FPC Florence.  The Administrator stated, "your cataract condition will be discussed with you further by USP Florence medical staff."  Response to Central Office Administrative Remedy Appeal, August 27, 2012, docket #47-1 at 15.

6.      Defendant Mark Kellar is a Registered Nurse who was the Health Services Administrator at the Federal Correctional Complex (FCC) in Florence, Colorado, which includes the FPC, from January 2010 to June 2013.  Declaration of Mark A. Kellar, February 19, 2014 ("Kellar Declaration"), ¶¶ 1, 2, docket #88-2.   Kellar was not involved in the decision to transfer Plaintiff from FCI Bastrop to FPC Florence on August 2, 2012. *Id.*, ¶ 8.

7.      On July 25, 2012, upon being transferred from FCI Bastrop, the health services transfer documentation was completed where cataracts are identified as a current chronic condition.  BOP Health Services Inmate Intra-System Transfer, July 25, 2012, docket #88-1 at 24. No travel restrictions were indicated and no medical holds were in place. *Id.*

8.      On August 2, 2012, Plaintiff arrived at FPC Florence from FCI Bastrop via the Federal Transfer Center, Oklahoma City, Oklahoma.  Kellar Declaration, ¶ 8, docket #88-2.

9.      BOP institutions with Physician Assistants on 24-hour coverage should normally complete

a medical screening at intake immediately after the inmate's arrival.  A complete medical evaluation is conducted subsequently in accordance with the Health Services Manual.  BOP Program Statement 5290.15, Intake Screening § 7(a)(2).

10.     Upon arrival at FPC Florence, Plaintiff was medically screened by Kellar, at which Kellar did not list "cataracts" under current painful conditions, current medical conditions, or other current treatments.  BOP Health Services Health Screen, August 2, 2012, docket #88-1 at 26-32.  Kellar renewed prescriptions and scheduled a consultation in the pulmonary chronic care clinic. *Id.* at 30.  Kellar instructed Plaintiff on the procedures to obtain medical, dental, and mental health care. *Id.*

11.     Kellar also referred Plaintiff to Defendant Dr. Wilson for a complete medical evaluation pursuant to Program Statement 5290.15, Intake Screening § 7(a)(2).  Kellar Declaration, ¶ 9, docket #88-2.

12.     The purpose of conducting a medical screening upon arrival at the facility is "to determine if there are medical reasons for housing the inmate away from the general population or for restricting temporary work assignments."  BOP Program Statement 5290.15, Intake Screening § 7(a)(2).

13.     Kellar does not possess the authority to approve cataract surgeries for inmates.  Kellar Declaration, ¶ 12, *see also* Pelton Declaration, ¶¶ 8, 17.

14.     Dr. Wilson evaluated the Plaintiff on August 13, 2012, as part of the chronic care clinic with the chief complaint being pulmonary/respiratory issues.  BOP Health Services Clinical Encounter, August 13, 2012, docket #88-1 at 33-37.  Plaintiff told Dr. Wilson that he had been previously approved to have cataract surgery. *Id.* at 33.  Upon examination of Plaintiff's eyes, Dr. Wilson noted that Plaintiff's extra ocular movements were intact and had a grossly normal retina. *Id.* at 34.

7

Plaintiff complained of "headaches associated with vision deficits [and] chronic hoarseness." *Id.* at 33. At the conclusion of the consultation, Dr. Wilson ordered an x-ray of Plaintiff's hip due to possible arthritis and a follow-up in six months; he also encouraged the Plaintiff to follow-up at sick call as needed. *Id.* at 36.

15.     On October 3, 2012, Plaintiff was referred to an optometrist, Steve Clough, O.D., who examined Plaintiff for a re-evaluation of bilateral cataracts due to the previous surgical authorization on May 18, 2012. BOP Health Services Clinical Encounter, October 3, 2012, docket #88-1 at 38-40. Dr. Clough notes the Plaintiff "does continue to wear spectacles although no reporting continued decrease in vision over past year." *Id.* at 38. After examining the Plaintiff, Dr. Clough noted that "[a]nterior ocular health unremarkable OU. Posterior ocular health remarkable for moderate posterior subcapsular cataract (PSC) formation OS>OD." *Id.* at 39. The examination revealed Plaintiff had best corrected visual acuity of 20/40 in his right eye and 20/60-2 in his left eye. *Id.*; *see also* Declaration of Steve Clough, Feb. 19, 2014 ("Clough Declaration"), ¶ 16, docket #88-1.

16.     The Bureau's Ophthalmology Guidance recommends cataract surgery when best corrected visual acuity is less than 20/60 in both eyes for the initial surgery and best corrected visual acuity of 20/100 for a second eye surgery. Clough Declaration, ¶ 16, docket #88-1; *see also* BOP Ophthalmology Guidance, February 2008, p. 5, docket #88-1 at 12-19.

17.     Dr. Clough "referred [Plaintiff] for cataract surgery and IOL placement OS followed by OD." BOP Health Services Clinical Encounter, October 3, 2012, docket #88-1 at 39. Accordingly, an ophthalmology consultation request was referred to the Utilization Review Committee ("URC"). *Id.*; *see also* BOP Health Services Consultation Request, docket #88-1 at 41-43. Dr. Clough also

scheduled the Plaintiff for a follow-up eye exam in December 2012 and discharged him to the housing unit with no restrictions. BOP Health Services Clinical Encounter, October 3, 2012, docket #88-1 at 39.

18.     On November 16, 2012, Kellar served on the URC, which favorably referred Dr. Clough's ophthalmology consultation request to the Regional Medical Director for final approval. Kellar Declaration, ¶ 11, docket #88-2; *see also* URC Inmate Notification Letter, November 16, 2012, docket #88-1 at 44.  Kellar was not a decision-maker while participating in the URC.  Kellar Declaration, ¶ 11.

19.     On November 28, 2012, the acting Regional Medical Director disapproved the ophthalmology consultation for lacking "the appropriate assessments and interventions" and referred the facility to "InterQual Smartsheets" or "Clinical Practice Guidelines" for requirements.  BOP Health Services Consultation Request, docket #88-1 at 43; *see also* URC Inmate Notification Letter, November 29, 2012, docket #88-1 at 45.

20.     On February 25, 2013, Plaintiff was seen by G. Santini, M.D. for a follow-up Chronic Care evaluation.  BOP Health Services Clinical Encounter, February 25, 2013, docket #88-1 at 46-48.  Dr. Santini noted that the ophthalmology exam was "rejected from region 11/12." *Id.* at 48.  The doctor referred Plaintiff for another optometry exam to "re-evaluate." *Id.*

21.     On March 13, 2013, Dr. Clough saw the Plaintiff again for "re-evaluation of cataract status." BOP Health Services Clinical Encounter, March 13, 2013, 2013, docket #88-1 at 49-52.  Plaintiff reported "continued decreased vision at distance and near with current bifocals due to advancing cataract formation." *Id.* at 49.  Dr. Clough concluded Plaintiff had "posterior subcapsular polar cataract 366.02 - current, chronic, worsened," and informed Plaintiff that "updating spectacle

correction will not provide great improvement in visual acuity and that a cataract evaluation with

IOL is best treatment at this time." *Id.* at 50.

22.     Dr. Clough submitted another consultation request to the URC for the Plaintiff to see an

ophthalmologist.  BOP Health Services Consultation Request, March 13, 2013, docket #88-1 at 53-

55.

23.     On April 18, 2013, Kellar served again on the URC, which favorably referred Plaintiff's

ophthalmology consultation request to the North Central Regional Medical Director for final

approval. Kellar Declaration, ¶ 11, docket #88-2; *see also* BOP Health Services Consultation

Request, March 13, 2013, docket #88-1 at 55; URC Inmate Notification Letter, April 18, 2013,

docket #88-1 at 56.  Kellar was not a decision-maker while participating in the URC.  Kellar

Declaration, ¶ 11.

24.     The Regional Medical Director approved the ophthalmology consultation for the Plaintiff

on May 2, 2013.  BOP Health Services Consultation Request, March 13, 2013, docket #88-1 at 55.


25.     On June 18, 2013, Plaintiff sought information from B. Vaughn, MRAS as to whether the

consultation had been approved.  Inmate Request to Staff, June 18, 2013, docket #88-1 at 57. B.

Vaughn confirmed that the request was approved and Plaintiff was "on the list of inmates to be

scheduled." *Id.*

26.     On August 14, 2013, Plaintiff saw Anak K. Shrestha, M.D. at the Rocky Mountain Eye

Center in Canon City.  Rocky Mountain Eye Care Center, Inc. Medical Record, August 14, 2013,

docket #88-1 at 58-61.  Dr. Shrestha recommended cataract extraction to improve the Plaintiff's

eyesight, which would not be improved with "changing glasses." *Id.* at 61.

10

27.     On August 30, 2013, Dr. Clough completed an administrative note for the Plaintiff entitled

"Ophthalmological cataract surgery consultation approval for treatment and intervention," stating,

> Ophthalmological consultation for bilateral cataract extraction performed with consulting surgeon on 08/14/2013 with concurring of cataract diagnosis and recommendation for surgical intervention with intraocular lens implants.  URC to review case in September 2013 to proceed and authorize surgical procedure. Cataract extraction postoperative care to be completed by Dr. Clough at FCC.

BOP Health Services Clinical Encounter - Administrative Note, August 30, 2013, docket #88-1 at

64.

28.     On September 19, 2013, the URC notified Plaintiff that the request for cataract surgery had

been referred to the Regional Office for final approval.  URC Inmate Notification Letter, September

19, 2013, docket #88-1 at 68.

29.     On October 4, 2013, Dr. Clough completed another administrative note for the Plaintiff

entitled, "Re-submittal of Ophthalmology Consultation Report for cataract evaluation and surgical

procedure with intraocular lens implant."  BOP Health Services Clinical Encounter - Administrative

Note, October 4, 2013, docket #88-1 at 62-63.  Dr. Clough also completed a Consultation Request

for Ophthalmology stating as the Reason for Request:

> Inmate reports decreased visual acuity at distance and near with developing bilateral cataract formation.  Best corrected visual acuity at 20' is right eye: 20/60+2 and left eye: 20/80+1. Cataract formation on clinical observation indicates right eye: 1+ nuclear sclerotic cataract along with a 2+ posterior subcapsular cataract and left eye: 1+ nuclear sclerotic cataract and 3+ posterior subcapsular cataract. Based on best corrected visual acuity, inmate meets BOP ophthalmology (2007 Guidelines) cataract surgery criteria. Inmate was evaluated by outside cataract surgeon on August 14, 2013 with concurring findings and recommendation for cataract surgery with implant. Recommendation made by me initially indicated cataract surgery on left eye due to more severity in vision loss when compared to right eye.
>
> Inmate to now be referred to Dr. Paul Rastrelli at Rocky Mountain Eye Center in Pueblo, Colorado for evaluation and intra-ocular lens implant in left eye. Inmate will return to FCC Florence for all post-operative care to completed by Dr. Steven

11

Clough. All necessary information garnered for this recommendation taken from last comprehensive eye examination on March 03, 2013 at FCC Florence.

*Id.*; *see also* BOP Health Services Consultation Request, October 4, 2013, docket #88-2 at 22-24.

30.     On October 21, 2013, Plaintiff sought information from B. Vaughn, MRAS as to whether his "ophthalmology case" had been approved by the Regional office.  Inmate Request to Staff, October 21, 2013, docket #88-1 at 67.  B. Vaugh responded on October 24 stating, "From what I understand, Region approved this case. Your surgery is pending scheduling priority at this time." *Id.*

31.     On January 22, 2014, the Plaintiff visited Dr. Clough with questions about the cataract surgical process.  BOP Health Services Clinical Encounter - Administrative Note, January 22, 2014, docket #88-1 at 74.  Dr. Clough spent ten minutes explaining the procedure using an online teaching tool and answering questions.  *Id.*

32.     The Plaintiff's eye condition interferes with his day-to-day functions and activities.  He suffers glare preventing him from seeing beyond a few feet.  Amended Complaint, docket #39 at 4.[3]

## LEGAL STANDARDS

### I.     Treatment of a *Pro Se* Plaintiff's Complaint

A federal court must construe a *pro se* plaintiff's "pleadings liberally, applying a less stringent standard than is applicable to pleadings filed by lawyers. [The] court, however, will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (quotations

---

[3]Typically, in the summary judgment context, a pro se litigant's verified complaint may be treated as an affidavit as long as it satisfies the standards for affidavits outlined in Rule 56.  *See Adams v. Dyer,* 223 F. App'x 757, 764 n.7 (10th Cir. 2007) (citing *Conaway v. Smith,* 853 F.2d 789, 792 (10th Cir. 1988)).

and citations omitted).  The Tenth Circuit interpreted this rule to mean, "if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  However, this interpretation is qualified in that it is not "the proper function of the district court to assume the role of advocate for the pro se litigant." *Id.*; *see also Peterson v. Shanks*, 149 F.3d 1140, 1143 (10th Cir. 1998) (citing *Dunn v. White*, 880 F.2d 1188, 1197 (10th Cir. 1989)).

## II.     Dismissal under Fed. R. Civ. P. 56

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).  The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the Court the factual basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."  *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).  Only admissible evidence may be considered when ruling on a motion for summary judgment.  *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir.

1985).

The non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, if the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original) (citation omitted); *see also Hysten v. Burlington Northern & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

Plaintiff does not specify in the caption or in the "Parties" section whether he sues Defendants in their official capacities, individual capacities, or both. However, Plaintiff specifies in his Request for Relief that he seeks monetary relief from the Defendants in their individual

capacities and injunctive relief from Defendants in their official capacities. The Court has subject

matter jurisdiction to hear Plaintiff's claim for injunctive relief against Keller in his official capacity

(*see* Recommendation, docket # 33, affirmed by Order, docket # 40). But, to be entitled to seek this

relief at trial, the Plaintiff must demonstrate there are genuine issues of material fact concerning his

Eighth Amendment claim.

## I.      Qualified Immunity

Kellar asserts that he is entitled to qualified immunity for the Eighth Amendment claim

against him in his individual capacity. Qualified immunity protects from litigation a public official

whose possible violation of a plaintiff's civil rights was not clearly a violation at the time of the

official's actions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is an entitlement not to

stand trial or face the other burdens of litigation. *Ahmad v. Furlong*, 435 F.3d 1196, 1198 (10th Cir.

2006) (internal quotations and citations omitted). The privilege is an immunity from suit rather than

a mere defense to liability. *Id.* When a defendant asserts the defense of qualified immunity, the

burden shifts to the plaintiff to overcome the asserted immunity. *Riggins v. Goodman*, 572 F.3d

1101, 1107 (10th Cir. 2009). "The plaintiff must demonstrate on the facts alleged both that the

defendant violated his constitutional or statutory rights, and that the right was clearly established at

the time of the alleged unlawful activity." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 231-32

(2009)).

The Supreme Court has discarded a review process that required courts to examine the

elements of qualified immunity sequentially, first considering whether a right had been violated, and

then second - if the court concluded a right had been violated - whether that right was clearly

established at the time of the alleged violation. *Pearson*, 555 U.S. at 232-44. *Pearson* retired this

process, instead affording courts the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236; *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009).

In this case, Plaintiff does not dispute that Kellar has met his initial responsibility of providing to the Court admissible factual evidence in support of his motion. Thus, the Court will begin by analyzing Plaintiff's claim against Kellar to determine whether Plaintiff has established genuine issues of material fact as to a violation of his Eighth Amendment right; if so, the Court will proceed to determine whether Plaintiff's right was clearly established at the time of the violation.

## II.    Eighth Amendment Claim

Under the Eighth Amendment, prisoners are constitutionally entitled to "humane conditions of confinement guided by 'contemporary standards of decency.'" *Penrod v. Zavaras*, 94 F.3d 1399, 1405 (10th Cir. 1996) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Prisoners state a claim of cruel and unusual punishment under the Eighth Amendment by alleging prison officials demonstrated "deliberate indifference to a prisoner's serious illness or injury," or that prison officials "have, with deliberate indifference," involuntarily exposed a prisoner to conditions "that pose an unreasonable risk of serious damage to [the inmate's] future health." *Helling v. McKinney*, 509 U.S. 25, 35 (1993); *Estelle,* 429 U.S. at 105.

Plaintiff must meet both the objective and subjective components constituting the test for Eighth Amendment deliberate indifference. *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006). The objective component is met "if the harm suffered is 'sufficiently serious' to implicate the Cruel and Unusual Punishment Clause." *Id.* (quoting *Kikumura v. Osagie*, 461 F.3d 1269, 1282

16

(10th Cir. 2006), *overruled in part on other grounds as recognized in Robbins v. Oklahoma*, 519 F.3d 1242, 1246-47 (10th Cir. 2008)).  "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999)).  "Moreover, a 'delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm.'" *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)).  The substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain. *Id.* (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)) (internal quotations omitted).  A delay in medical treatment that is unintentional or unavoidable, even though it may result in the inmate suffering additional harm, is not actionable. *See, e.g., Estelle*, 429 U.S. at 104-05 ("indifference is manifested . . . by prison guards in *intentionally* denying or delaying access to medical care") (emphasis in original).

The subjective component is met if the plaintiff demonstrates defendants "knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Callahan*, 471 F.3d at 1159 (quoting *Kikumura*, 461 F.3d at 1293).  The subjective component requires an "inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment." *Kikumura*, 461 F.3d at 1293 (quoting *Farmer*, 511 U.S. at 838).  This component is equivalent to "criminal recklessness, which makes a person liable when she consciously disregards a substantial risk of harm." *Beauclair v. Graves*, 227 F. App'x 773, 776 (10th Cir. 2007) (quoting *Mata*, 427 F.3d at 752).  "A prisoner may satisfy the subjective component

17

by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of [the] condition." *Mata*, 427 F.3d at 755.  However, "a delay in medical care 'only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm.'" *Mata*, 427 F.3d at 751 (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)).  Substantial harm includes "lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001).

Here, to survive summary judgment on the alleged constitutional violation, the Plaintiff must demonstrate genuine issues of material fact as to whether (1) Kellar personally participated in the challenged actions, and (2) Kellar was deliberately indifferent to a substantial risk of serious harm to Plaintiff arising from his actions.

A.    Personal Participation

Personal participation is an essential allegation in a civil rights action.  *See Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976). "To establish *Bivens* liability, a plaintiff is required to bring forth evidence that an individual defendant directly and personally participated in the purported constitutional violation." *Persaud v. Doe*, 213 F. App'x 740, 743 (10th Cir. 2007) (citing *Steele v. Fed. Bureau of Prisons*, 355 F.3d 1204, 1214 (10th Cir. 2003), *cert. denied*, 543 U.S. 925 (2004), *overruled on other grounds by Jones v. Bock*, 549 U.S. 199, 127 S. Ct. 910, 921 (2007)). "A plaintiff must plead that each government-official defendant, though the official's own individual actions, has violated the Constitution." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 768 (10th Cir. 2013).  In *Kansas Penn Gaming, LLC*, 656 F.3d at 1215, the Tenth Circuit noted that in a civil rights case asserting claims against individual government actors, "it is particularly important ... that the complaint make clear exactly who is alleged to have done what to whom, to

18

provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations" against an entire group of defendants.

The liability of a supervisor in a civil rights action "requires allegations of personal direction or of actual knowledge and acquiescence." *Langley v. Adams County, Colo.*, 987 F.2d 1473, 1481 (10th Cir. 1993) (quoting *Woodward v. City of Worland*, 977 F.2d 1392, 1400 (10th Cir. 1992)). "The plaintiff therefore must show an 'affirmative link' between the supervisor and the constitutional violation. *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010). This requires more than "a supervisor's mere knowledge of his subordinate's" conduct. *See Iqbal*, 556 U.S. at 677. Accordingly, the Tenth Circuit has listed three elements required to establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities: (1) personal involvement; (2) causation, and (3) state of mind. *Dodds*, 614 F. 3d at 1195.

With respect to Kellar, Plaintiff alleges that "although he ought to have made arrangements for the surgery, [Kellar] compelled me to run through the process all over again, [which was] further delayed because there was not any contract with an Ophthalmologist at the time."  Amended Complaint, docket #39 at 4.  Plaintiff also contends that Kellar required that the consultation and surgery requests be approved by the Regional office, further delaying the process. *Id.* Under "Fact Eight," Plaintiff asserts,

> Defendant Keller [sic] did not need to run me through the process of gaining approval for the surgery; as HSA he had both the authority and duty to see that I was treated for a serious medical condition which had already been diagnosed by a physician and for which surgery had been prescribed and approved.

*Id.* at 6.  With respect to the "affirmative link" requirement, Plaintiff alleges

> HSA Keller [sic] is a "gatekeeper" in the sense that he is empowered and instructed to "direct all aspects of the [medical] department's administration ... and maintains control over HSU contracts," etc. (P6010 .02 (b)). HSA Keller's [sic] "gatekeeping"

19

> duties and his participation in the decision to delay treatment already prescribed and approved is evident in that he met with Plaintiff upon his arrival at this FPC, examined the medical records, and then intentionally delayed the implem[en]tation of the surgery by requiring Plaintiff to be examined by Dr. Wilson – having no experience with eye disease – and knowing, as the HSA that there was no contract with an ophthalmologist, and then participated in further delays by insisting that the request be forwarded again to Region for approval (which was denied).

*Id.* at 8.  In the current briefing, Plaintiff argues that he does not dispute Kellar had no authority to approve cataract surgery but, rather, contends that Kellar had the authority to arrange for and schedule an already approved cataract surgery.  Plaintiff states that, since Kellar did nothing in that regard, Plaintiff was required to repeat the approval process which delayed cataract treatment.

Here, the Plaintiff must show genuine issues of material fact as to whether there is an affirmative link between the alleged constitutional violation (delay or denial of cataract surgery) and Kellar's participation, control or direction, or failure to supervise.  Plaintiff does not appear to claim or argue that Kellar had supervisory authority over anyone who could treat his cataracts; thus, it appears the affirmative link requirement depends upon whether Kellar had the duty and/or authority to arrange and schedule a cataract surgery approved in another region.

Kellar counters that he did not.  In support of his motion, Kellar attaches a sworn declaration from James Pelton, M.D., BOP Western Regional Medical Director for certain states other than Colorado.  Dr. Pelton attests that

> Upon arrival at FPC Florence, Mr. Ervin was required to contact the Health Services Department to renew the process of obtaining approval to be evaluated by an outside ophthalmologist for cataract surgery ... because an outside ophthalmologist would not agree to perform surgery based upon the examination/records of another clinician. Also, the consultation request for outside ophthalmology review would need to be approved by the FPC Florence URC and Regional Medical Director with authority over federal inmates in Colorado in accordance with the Bureau Ophthalmology Guidance.

In summary, Plaintiff's prior cataract surgery approval in Texas did not equate to

automatic approval in Colorado upon being transferred to FPC Florence. This is because Plaintiff would need to be evaluated by an outside ophthalmologist in Colorado, for continuity of care, prior to any cataract surgery being performed. In accordance with the above-cited policy, the procedures to be evaluated by an outside ophthalmologist in Colorado require, at a minimum, a referral by the URC to the Regional Medical Director, with authority over federal inmates in Colorado, for final approval.

Mark Kellar, as the Complex Health Services Administrator at FCC Florence, followed established protocols in referring Plaintiff to a staff physician (Dr. Wilson) which initiated the ophthalmology consultation request upon Plaintiffs arrival at FPC Florence. Mr. Kellar's authority, upon the intake screening process, was limited to referring Plaintiff to the staff physician (Dr. Wilson), which occurred pursuant to established procedures. Mr. Kellar did not have the authority to refer Plaintiff directly to an ophthalmologist or optometrist, nor did he have the authority to approv[e] ophthalmologic services (cataract consultation or surgery). Notwithstanding, in his role as a member of two URCs, Mr. Kellar recommended that Mr. Ervin be evaluated by an outside ophthalmologist. In Mr. Kellar's limited role in providing medical care to Plaintiff, Mr. Kellar timely referred Mr. Ervin to Dr. Wilson and referred twice Mr. Ervin's request to be evaluated by an outside ophthalmologist, which was the extent of Mr. Kellar's medical contact with Mr. Ervin.

Pelton Declaration, ¶¶ 15, 16, 17, docket #88-3.   Dr. Pelton attaches a copy of the BOP Ophthalmology Guidance to his declaration; under "referrals" for "surgical evaluations" it states, "The Regional Medical Director (in consultation with a BOP consultant ophthalmologist, as necessary) must approve all *elective* ophthalmological surgery, including surgery for cataracts ...." Ophthalmology Guidance, Federal Bureau of Prisons, February 2008, ¶ 4 ("Referrals"), docket #88-3 at 10-16 (emphasis in original).   Also, under "ophthalmologic care" the Guidance states, "To receive an evaluation by an ophthalmologist, a referral must be made by an optometrist, a physician or mid-level practitioner."   *Id.*, ¶ 1 ("Ophthalmologic Care").

With respect to Kellar's duties as a Health Services Administrator (HSA), Plaintiff refers to Program Statement 6010.02, titled "Health Services Administration," which lists the following duties for HSAs:

21

- plans, implements, and directs all aspects of the department's administration, including: supervision of administrative personnel; procurement; supply; drug-free workplace program; housekeeping; sanitation; and maintenance;

- provides supervision and direction for ancillary departments, including: pharmacy; laboratory; radiology; physical therapy; social workers; and health records. Provides supervision and direction to these Health Services staff, including designation of shifts and assignment of general and specific duties;
- represents the department on various committees and in other interdepartmental meetings or negotiations;

- prepares quarterly statistical reports to help monitor the health care services provided;

- supervises inmates assigned to the Health Service Unit (HSU) and organizes and directs training for inmate workers;

- responsible for the orientation and non-clinical training of staff assigned to the HSU, to include correctional officers

- must be knowledgeable of personnel regulations applicable to both civilian and Public Health Services (PHS) Commissioned Corps personnel;

- ensure that health care staff are appropriately licensed, registered, or certified;
- responsible for budget and procurement activities including controlling purchases, maintenance, and distribution of equipment, materials, and facilities of the HSU; and

- certifies vouchers for payment submitted in connection with consultant care or other "outside" medical services to verify their accuracy.

BOP Program Statement 6010.02(7)(b), January 15, 2005.

After review of the Plaintiff's and Dr. Pelton's testimony, as well as the prison standards and guidance cited by the parties, the Court concludes that Plaintiff fails to demonstrate a genuine issue of material fact concerning whether Kellar participated in, directed or controlled any delay or denial of the cataract surgery approved in a different region. While Plaintiff "quotes" from the program statement listing an HSA's duties in support of his argument, the Court finds such quotes taken out

of context or missing completely from the program statement.  For instance, the quote "maintains control over HSU contracts" (*see* Amended Complaint, docket #39 at 6 ("Fact Six") and at 8) appears nowhere in the statement; rather, Plaintiff appears to take out of context Kellar's "responsib[ility] for budget and procurement activities including controlling purchases, maintenance, and distribution of equipment, materials, and facilities of the HSU."  This duty does not support Plaintiff's claim that Kellar had a duty to arrange and schedule a cataract surgery approved in another region.

Moreover, Plaintiff quotes the HSA's duty to "direct all aspects of the [medical] department's administration" for Plaintiff's argument that Kellar was a "gatekeeper" for other medical personnel capable of treating a condition in an emergency situation.  *See* Amended Complaint, docket #39 at 8 (citing *Sealock*, 218 F.3d at 1211).  However, the program statement specifies the types of administration for which an HSA is required to plan, implement and direct: "supervision of administrative personnel; procurement; supply; drug-free workplace program; housekeeping; sanitation; and maintenance."  Clearly, Kellar's duty to plan, implement and direct the medical department's administration does not include the arranging and/or scheduling of any surgeries, including Plaintiff's cataract surgery.

Therefore, the program statement listing an HSA's duties does not support Plaintiff's arguments in this case.  However, as Kellar argues, Kellar was not necessarily acting as an HSA at Plaintiff's intake into the FPC but, rather, as a "medical screener" pursuant to BOP Program Statement 5290.15, Intake Screening § 7(a)(2).  The program statement provides that "BOP institutions with Physician Assistants on 24-hour coverage should normally complete a medical screening at intake immediately after the inmate's arrival. A complete medical evaluation is

conducted subsequently in accordance with the Health Services Manual." *Id.*

Here, it is undisputed that Kellar conducted a medical screening of the Plaintiff at his intake, and that Kellar referred the Plaintiff to Dr. Wilson for a complete medical evaluation, which occurred 11 days later.  In fact, Plaintiff faults Kellar for "requiring Plaintiff to be examined by Dr. Wilson," rather than arranging for the surgery.  However, Kellar followed the program statement by ensuring that Plaintiff was scheduled for a complete medical examination; there is no indication in the record demonstrating that Kellar had a duty to schedule any other medical treatments or procedures.

Furthermore, Plaintiff contends that Kellar, in his role on the URC, "required" that the consultation and surgery requests be approved "again" by the Regional Medical Director.  However, Dr. Pelton attaches a copy of Program Statement 6031.03 entitled "Patient Care," which sets forth the duties and responsibilities of the URC, pertinent to this case, as follows:

8. **UTILIZATION REVIEW**

...

The URC will review the following areas:

•      Outside medical, surgical, and dental procedures;

...

a.  **Recommendations**. The URC must select one or more of the following, to address each case presented to it:

•      Approve the request without modification.

•      Refer the inmate for further evaluation to a staff physician.

•      Refer the inmate for further evaluation to a specialty consultant.

•      Put the inmate on a waiting list, with recommended parameters as to the

length of time the procedure may be delayed without increasing the risk of additional morbidity.

• Determine that the procedure is contraindicated, due to unacceptable risk to the inmate if it is performed.

• Deny the request for the procedure.

Program Statement 6031.03, ¶ 8, docket #88-3 at 8. As set forth above, the Ophthalmology Guidance requires that elective surgeries, such as cataract surgery, be approved by the Regional Medical Director. Thus, to the extent that Kellar, in his role on the URC, *approved* the consultation and surgical requests to be sent to the Regional Medical Director for final approval, the Court cannot conclude that Plaintiff participated in, controlled or directed the alleged denial or delay of his cataract surgery. Consequently, the Plaintiff has failed to show genuine issues of material fact concerning whether there is an affirmative link between the alleged constitutional violation (delay or denial of cataract surgery) and Kellar's participation, control or direction in such alleged violation.

Accordingly, the Court respectfully recommends that the District Court find Plaintiff has failed to demonstrate genuine issues of material fact concerning Kellar's personal participation in Plaintiff's alleged Eighth Amendment claim, and grant Kellar's motion for summary judgment on this issue.

B.    Deliberate Indifference

Mindful that the District Court may disagree and find that Plaintiff has demonstrated issues of fact concerning Kellar's personal participation, the Court will proceed to determine whether Plaintiff has demonstrated factual issues concerning the alleged Eighth Amendment violation. As set forth above, Plaintiff must meet both the objective and subjective components constituting the

test for deliberate indifference. *Callahan*, 471 F.3d at 1159.

        1.     Objective Component

Here, Plaintiff alleges that his cataracts and need for treatment are objectively serious to warrant Eighth Amendment protection from a delay or denial of medical treatment. Kellar counters that, because a Colorado ophthalmologist did not determine Plaintiff required surgery until after Kellar separated from employment with the BOP, and because it is undisputed that cataract surgery is elective, the Plaintiff has not demonstrated that his condition is sufficiently serious. The Court agrees with Plaintiff; as determined previously in this case, before arriving at the FPC, Plaintiff had been recently diagnosed with cataracts severe enough to warrant a physician's recommendation for surgery. *See Horton*, 123 F. App'x at 371. Therefore, the Court finds that Plaintiff has demonstrated the objective component of an Eighth Amendment claim.

        2.     Subjective Component

As for the subjective component, Plaintiff must demonstrate genuine issues of material fact as to whether Kellar denied medical treatment by disregarding a risk of substantial harm or whether Kellar delayed medical treatment by causing either unnecessary pain or a worsening of the condition resulting in substantial harm, which includes "lifelong handicap, permanent loss, or considerable pain." *See Mata*, 427 F.3d at 751 (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)); *see also Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001).

Plaintiff argues that his cataracts have caused him to suffer glare and a decrease in vision, which will culminate in blindness if left untreated. As it appears to be undisputed in this case that cataract surgery is "elective" and that the doctors have characterized Plaintiff's condition as "non-emergent," the Court is unsure and has no basis to determine whether Plaintiff would actually

become blind if he did not undergo surgery.  The evidence does suggest that Plaintiff's condition has worsened since he arrived at the FPC; however, Plaintiff does not provide evidence demonstrating an issue of fact as to whether the worsened condition has resulted in "lifelong handicap, permanent loss or considerable pain."   In fact, the Colorado doctors' recent recommendations for surgery suggest that Plaintiff's condition will be improved with IOL treatment.  Plaintiff has mentioned nothing about whether the cataracts cause him pain.  Accordingly, the Court cannot conclude that Plaintiff has demonstrated genuine issues of material fact concerning whether any delay by Kellar (or any other BOP health care provider) has violated Plaintiff's Eighth Amendment right.

Furthermore, as to whether Kellar disregarded a risk of substantial harm, Plaintiff contends that Kellar had the duty and responsibility to arrange and schedule the cataract surgery upon the Plaintiff's arrival at FPC but, instead, referred the Plaintiff to Dr. Wilson who "ha[d] no experience with eye disease."   Amended Complaint, docket #39 at 8.  As set forth above, the Court has determined that Plaintiff fails to demonstrate any issue of fact concerning whether Kellar's duties and responsibilities required, or even allowed, Kellar to arrange a cataract surgery that was approved in a different region.  Thus, even if Kellar knew about Plaintiff's cataracts at intake (which, notably, was not reported on the intake sheet), he, as a registered nurse, had no duty nor ability to refer the Plaintiff to an outside ophthalmologist to perform the surgery.  *See* Ophthalmology Guidance, Federal Bureau of Prisons, February 2008, ¶ 1 ("Ophthalmologic Care"), docket #88-3 at 12 ("To receive an evaluation by an ophthalmologist, a referral must be made by an optometrist, a physician or mid-level practitioner.").  Consequently, Kellar could not have disregarded a risk of substantial harm at Plaintiff's intake.

In addition, the Plaintiff has failed to demonstrate Kellar, in his role on the URC, disregarded a substantial risk of harm.  Kellar's limited duties on the URC included reviewing requests for outside medical treatment, consultations and surgeries.  *See* Program Statement 6031.03, ¶ 8, docket #88-3 at 8.  Because requests for elective surgery must be approved by the Regional Medical Director (Ophthalmology Guidance, ¶ 4, docket #88-3 at 15-16), it follows that the URC was limited in its approval and decision-making authority to simply approving (or denying) that such requests be sent to the Regional office for final approval.  By approving the requests for consultation and surgical evaluation by an outside ophthalmologist, Kellar did not ***disregard*** a risk of substantial harm but, rather, ***recognized*** the need for surgical treatment for Plaintiff's cataracts.

Accordingly, this Court respectfully recommends that the District Court find Plaintiff has failed to demonstrate genuine issues of material fact as to the subjective component of his Eighth Amendment claim and grant Kellar's motion for summary judgment.

## CONCLUSION

Because the Plaintiff has failed to demonstrate genuine issues of material fact concerning whether Kellar personally participated in the alleged constitutional violation and as to whether Kellar disregarded a risk of substantial harm, the Court recommends that the District Court find Kellar is entitled to qualified immunity as to the Eighth Amendment claim against him in his individual capacity and Plaintiff has failed to show entitlement to proceed to trial for his claim against Kellar in his official capacity.  Therefore, based on the foregoing and the entire record herein, this Court respectfully RECOMMENDS that Defendant Kellar's Motion for Summary Judgment as to the merits of Plaintiff's Eighth Amendment claim [filed February 20, 2014; docket #88] be **GRANTED**.

Entered and dated at Denver, Colorado, this 24th day of March, 2014.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge